## MOTOR CARRIER TRANSPORTATION CONTRACT

THIS AGREEMENT, (the "Agreement") made as of the 26 day of July, 2018 by and between YM P enterprise (hereinafter referred to as "Carrier" and EXPRESS FREIGHT SYSTEMS, Inc. a Corporation located at 20 Murray Hill Parkway Suite 270 East Rutherford, NJ 07073 (hereinafter referred to as "Broker").

1. Express Freight Systems, Inc. is duly licensed by the federal Highway Administration /FHWA (formerly interstate Commerce Commission) to engage in operations, in interstate or foreign commerce, as a broker, arranging for transportation of freight (except household goods) by motor vehicle MC# 523258 B.

2. Carrier is a duly licensed contract motor carrier operating under Docket # MC 598327 issued by the ICC/FHWA for the purpose of providing the transportation of property for shippers and receivers of general commodities.

3. Broker agrees to offer for shipment and CARRIER agrees to transport on its own equipment at least 100,000 pounds annually in a series of shipment and additional quantities of freight as Broker may tender subject to the availability of suitable equipment.

4. BROKER agrees to pay CARRIER for the transportation of freight moved under this agreement in accordance with the rates set forth in Schedule "A" attached hereto and made part hereof. Modifications or additions to these rates must be made in writing to meet specific shipping schedules. Confirmation of agreed rates will be faxed immediately by BROKER to CARRIER and if this confirmation is not in accord with CARRIER'S understanding CARRIER will advise BROKER by fax before making the pick up of the shipment. In addition, confirmation of any fax agreed rates should be made by CARRIER'S billing and BROKER'S payment thereof. CARRIER'S warrants that any rate quoted via fax is a lawful rate. If BROKER pays the freight invoice in a reduces amount, such amount shall constitute the agreed rate, unless carrier indicated to the contrary to BROKER within thirty (30) days of its receipt of payment. All modifications and additions to rates must be confirmed in writing.

5. BROKER and CARRIER agree that transportation service hereunder are to be performed as a contract carrier in compliance with 49 U.S.C 10102 by assigning motor vehicle for a continuing period of time for the exclusive use of BROKER or by providing specialized services or equipment designated to meet the distinctive need of BROKER of the consignor. Such services shall include, when applicable, but shall not be limited to: protective services, multiple stops in transit, direct dispatch, drop shipments, inside deliveries, spotting trailers, and expedited shipment,

6. CARRIER will be responsible to comply with all applicable ICC/FHWA and D.O.T regulations as well as other federal and state regulations pertaining to the operation of a motor carrier.

7. CARRIER has authority from the I.C.C/FHWA to operate as contract carrier and will maintain this authority and insurance for the protection of the public as required by the I.C.C. / FHWA and for protection of cargo in the amount of $100,000.00. The amount of cargo insurance required may be increased by notification to meet the added valuation for specific shipment. Cargo insurance shall be in the form required by 49 C.F.R.1043.2(b), and shall lave no exclusions or restrictions that would not be accepted by the I.C.C / FWHA for filing under statutory requirements. Furthermore, the carrier is required to carry AUTO LIABILITY in the amount of $1,000,000.00 with an A-7 rated insurance carrier.

7.B. Carrier shall cause its insurance carriers to forward forthwith to BROKER, certificates of insurance, which certificates shall require said insurance carriers to give BROKER written notice thirty (30) days prior to the cancellation of policy or policies, or of any reduction in or limitation in the coverage provided thereunder.

8. Carrier shall issue a bill of lading in its own name and shall be liable to the owner of the freight for full actual loss and damage to the freight under this agreement while in the care and custody of the CARRIER. All claims for loss and damage and salvage shall be handled and processed in accordance with the regulations of the I.C.C. / FHWA as published in the code of Federal Regulations (49 C.F.R. 1005). Carrier agrees in acknowledge receipt of any claim in writing to the BROKER within 10 days after the date of receipt of the claim. Carrier also agrees to pay, decline, or make a firm compromise settlement offer in writing to the BROKER within 20 days after receipt of any claim by CARRIER. If the claim remains pending after 30 days of receipt, the BROKER shall offset the value of the claim with the freight bills due CARRIER.

9. CARRIER agrees to hold BROKER harmless and indemnify BROKER for any liability resulting from loss or damage to any freight transported by CARRIER pursuant to this agreement including all costs to defend claim. CARRIER also agrees to hold BROKER harmless and indemnify BROKER for any liability resulting from personal injury or property damage, which may occur during the operation of CARRIER pursuant to this agreement including all costs to defend claims. CARRIER also assumes full responsibilities for all salaries, insurance taxes, pensions, and benefits of the CARRIER'S employees in performance of this contract as now or hereafter apply.

10. CARRIER will bill all charges for transportation services to BROKER and CARRIER shall provide BROKER with a copy of the signed bill of lading and delivery receipt. The relationship of the CARRIER to BROKER shall, at all times be that of an independent contractor.

11. CARRIER agrees to support and protect BROKER'S effort in performance of this agreement by refraining from ANY direct contact or solicitation of BROKER'S

customers. During the term of this agreement and for a period of 2 years from the time of termination of this agreement, CARRIERS shall not directly or indirectly solicit or do business of a transportation or warehouse nature with any of BROKER'S customers who are serviced by CARRIER as a result of this agreement unless otherwise agreed to in writing. If carrier breaches this agreement and customer tenders freight to CARRIER directly, the BROKER is then entitled to a commission from the CARRIER of 25% of the transportation revenue received on the movement of the traffic and to any damages that may be incurred. The CARRIER shall also refrain from any direct contact or solicitation of any carriers that BROKER may use if and when the BROKER moves freight for CARRIER.

12. Obligations of this agreement are separate and divisible and in the event that any clause is deemed unenforceable, the balance of the agreement shall continue in full force and effect.

13. CARRIER agrees that BROKER'S compensation hereunder for its services is confidential and need to be disclosed to CARRIER. Carrier further agrees that it will not reveal to anyone the terms of this agreement, the pricing of transportation services, or any other details of the business conducted between CARRIER and BROKER.

14. This agreement shall be deemed to be effective on the first date that CARRIER and BROKER commenced business together and the parties agree that the provisions contained herein properly express and memorialize the complete understanding of the parties as contained in all prior agreements, both verbal or in writing. This agreement shall be effective continuously subject to the right of either party here to cancel the agreement at any time upon not less than (30) days written notice of one party to another.

CARRIER NAME _Vol Vits Enterprise_   EXPRESS FREIGHT SYSTEMS, Inc.

_____   _____
AUTHORIZED SIGNATURE                AUTHORIZED SIGNATURE

_Volvik Mendlouie_                  _____
PRINT NAME                          PRINT NAME

_7/26/19_                           _____
DATE                                DATE